No. 23-2297

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

IN RE FTX TRADING, ET AL.,

Debtors

ANDREW R. VARA, UNITED STATES TRUSTEE FOR REGIONS THREE AND NINE,

*Appellant,*

*v.*

FTX TRADING ET AL.,

*Appellees.*

On Direct Appeal from Order dated February 21, 2023, entered by the United States Bankruptcy Court for the District of Delaware, Case No. 22-11068 (JTD)

## BRIEF OF AMICI CURIAE LAW PROFESSORS IN SUPPORT OF APPELLANT ON THE ROLE OF BANKRUPTCY EXAMINERS IN CHAPTER 11 REORGANIZATION

Jonathan C. Lipson
Harold E. Kohn Professor of Law
Temple University
Beasley School of Law
1719 North Broad Street
Philadelphia, PA 19122
Telephone: (215) 204-0608

Irv Ackelsberg
John J. Grogan
David A. Nagdeman
LANGER GROGAN & DIVER, P.C.
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Telephone: (215) 320-5660

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................... iii-vi

INTEREST OF THE *AMICI CURIAE* .................................................. 1

SUMMARY OF ARGUMENT .......................................................... 2

ARGUMENT ............................................................................. 7

I.  PUBLIC AND CREDITOR INTERESTS REQUIRE A TARGETED
    INDEPENDENT INVESTIGATION AND REPORT ON THE
    SPECTACULAR RISE AND FALL OF FTX ................................. 7

    A.  The Public and Creditors Have a Strong Interest in
        Understanding the Causes and Consequences of Major
        Corporate Failures ................................................ 7

    B.  "None" Is Not an "Appropriate" Examination of the
        FTX Debtors. ...................................................... 12

        1.  The Public and Creditors Have an Inherent Interest in
            Understanding "Freefall" Bankruptcies ..................... 12

        2.  An Examiner Should Address the Secrecy of the Case ........... 14

        3.  An Examiner Should Investigate and Report on the Novel
            Legal Status of FTX-held Cryptocurrency. .................. 17

II. PROFESSIONALS' POTENTIAL CONFLICTS OF INTEREST
    WARRANT APPOINTMENT OF AN INDEPENDENT EXAMINER ........ 18

    A.  Counsels' Prebankruptcy Representations of FTX ............. 19

    B.  Sullivan & Cromwell's Disputed Role in the FTX
        Change of Control .............................................. 22

    C.  Sullivan & Cromwell's Ongoing Role in Insiders'
        Prosecutions .................................................... 25

CONCLUSION ......................................................................... 29

APPENDIX: LIST OF *AMICI CURIAE* ................................................................30

CERTIFICATES OF COMPLIANCE ....................................................................35

CERTIFICATE OF SERVICE ...............................................................................37

# TABLE OF AUTHORITIES

CASES

*Comm. of Equity Sec. Holders v. Lionel Corp.*,
   722 F.2d 1063 (2d Cir. 1983) .................................................................10

*In re Celsius Network LLC*,
   647 B.R. 631 (Bankr. S.D.N.Y. 2023), *leave to appeal denied*, No. 23-CV-523
   (JPO), 2023 WL 2648169 (S.D.N.Y. Mar. 27, 2023) ............................. 4, 17, 18

*In re CRED Inc.*,
   No. 20-12836 (Bankr. D. Del.) ..............................................................17

*In re Enron Corp.*,
   No. 01-16034 (Bankr. S.D.N.Y.) ............................................................3

*In re FTX Trading*,
   No. 22-11068 (Bankr. D. Del.) ...................................................... *passim*

*In re Ira Haupt & Co.*,
   361 F.2d 164 (2d Cir. 1966) ...................................................................28

*In re Lehman Brothers Holdings, Inc.*,
   No. 08-13555 (Bankr. S.D.N.Y.) ...................................................... *passim*

*In re Lyondell Chemical Co.*,
   No. 09-10023 (REG) (Bankr. S.D.N.Y.) ...................................................3

*In re Mirant Corp.*,
   No. 03-46591 (Bankr. N.D. Tex.). ..........................................................3

*In re New Century TRS Holdings, Inc.*,
   No. 07-10416 (Bankr. D. Del.) ...............................................................3

*In re Purdue Pharma*,
   No, 19-23649 (Bankr. S.D.N.Y.) ...........................................................15

*In re Revco D.S., Inc.*,
   898 F.2d 498 (6th Cir. 1990) ..............................................................9, 12

*In re Washington Mutual, Inc., et al.*,
   No. 08-12229 (Bankr. D. Del.) ................................................................3

*In re Worldcom*,
   No. 02-13533 (Bankr. S.D.N.Y.) ............................................................... 3, 4, 9, 12

*Mach Mining, LLC v. E.E.O.C.*,
   575 U.S. 4280 (2015) ......................................................................................10

*Pansy v. Borough of Stroudsburg*,
   23 F.3d 772 (3d Cir. 1994) ..............................................................................14

*See In re Alterra Healthcare Corp.*,
   353 B.R. 66 (Bankr. D. Del. 2006).....................................................................15

*U.S. v. Bankman-Fried*,
   No. 22-cr-00673 (S.D.N.Y.) .............................................................................26

### STATUTES

11 U.S.C. § 107(a) ..............................................................................................14

11 U.S.C. § 704 ...................................................................................................16

11 U.S.C. § 1104(c) ............................................................................... 1, 2, 20, 29

11 U.S.C. § 1106 .................................................................................................16

11 U.S.C. § 1106(a) .............................................................................................19

11 U.S.C. § 1107(a) ..........................................................................................4, 19

54 AM. BANKR. L.J. 29 (1980) .............................................................................8

124 CONG. REC. S17 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini) ..........8

Bankruptcy Reform Act of 1978..............................................................................8

H.R. Rep. No. 95-595 (1977).................................................................................7

### OTHER AUTHORITIES

Archer, Rick, *FTX Examiner Report OKs $111M In Professional Fees*
   https://www.law360.com/articles/1718547/ (Sept. 6, 2023)......................... 14, 28

Bruce, Kara J., *[Redacted]: Creditor Privacy in Bankruptcy's Fishbowl,* 43:3
   BANKR. L. LETTER 9 (Mar. 2023)......................................................................16

Bussel, Daniel J., *A Third Way: Examiners As Inquisitors*, 90 AM. BANKR. L.J. 59 (2016)...................................................................................................12

Coordes, Laura N., *Examining Examiners,* 43:2 BANKR. L. LETTER 1 (Feb. 2023) ...........................................................................................17

*Exclusive Transcript: The Full Testimony Bankman-Fried Planned to Give to Congress*, FORBES, Dec. 13, 2022, https://www.forbes.com/sites/stevenehrlich/2022/12/13/exclusive-transcript-the-full-testimony-sbf-planned-to-give-to-congress...................................................23

*Examiners in Bankruptcy Cases, A Guide for Examiners, Courts and Practitioners* (N.Y. City Bar. 2013-14) ..............................................................11

Harner, Michelle M. and Marincic Griffin, Jamie, *Facilitating Successful Failures,* 66 Fla. L. Rev. 205 (2014)....................................................10

Hershey, Samuel P. and Sutherland-Smith, Kathryn, *Two Sides of the Same Coin? Cryptoassets and Estate Property in Bankruptcy*, AM. BANKR. INST. J., Aug. 2022.............................................................................................17

Levy, Aaron, *The Role of the Securities and Exchange Commission and the Judicial Functions under the Bankruptcy Reform Act of 1978* .............................8

Lipson, Jonathan C., *The Rule of the Deal: Bankruptcy Bargains and Other Misnomers,* 97 AM. BANKR. L.J. 41 (2023) ........................................................13

Lipson, Jonathan C., *Understanding Failure: Examiners and the Bankruptcy Reorganization of Large Public Companies*, 84 AM. BANKR. L.J. 1 (2010).......................................................................... 8, 12, 13, 32

Lipson, Jonathan C. and Marotta, Christopher Fiore, *Examining Success,* 90 AM. BANKR. L.J. 1 (2016) ..................................................... 9, 12, 32

Lupica, Lois, R. and Rapoport, Nancy B., *Best Practices for Working with Fee Examiners,* 32 AM. BANKR. INST. J. 20 ..................................................7

Oliver, Joshua, *'Sam? Are you there?!' The bizarre and brutal final hours of FTX*, FIN. TIMES, Feb. 9, 2023, https://www.ft.com/content/6e912f25-f1b7-4b19-b370-007fbc867246..............21

Rule 4.1, *NYSBA NY Rules of Professional Conduct* (2021)....................................25

Warren, Elizabeth, *Bankruptcy Policy*, 54 U. CHI. L. REV. 775 (1987) ..................10

## **INTEREST OF AMICI**

*Amici curiae*, whose biographical information appears on Appendix A ("Amici"), are professors at law schools in the Third Circuit and around the nation. They study and write extensively about bankruptcy and related business law subjects. Their work has appeared in many of the nation's leading academic journals, and includes path-breaking scholarship on the use of bankruptcy examiners in freefall and cryptocurrency cases.

Amici share a commitment to the transparent and efficient administration of the chapter 11 system, and a belief that the interest of the public and creditors in this large and notorious chapter 11 case must be vindicated by an independent examination as contemplated by Congress in section 1104(c) of the United States Bankruptcy Code.

The parties to this appeal have consented to the filing of this brief amicus curiae.

## SUMMARY OF ARGUMENT

The United States Trustee ("UST") sought the appointment of an examiner in these cases by Motion dated December 1, 2022 (the "Examiner Motion"). *See* J.A. 95. The Bankruptcy Court denied the Examiner Motion at a hearing February 15, 2023. Tr. of Hr'g Before the Hon. John T. Dorsey U.S. Bank'r Judge, 6:25, Feb. 15, 2023, 22-11068, Doc. 737 (hereinafter Feb. 15 Hr'g Tr.).

This was an error for four reasons.

1.    *The interests of creditors and the public require an independent examination of this large and notorious bankruptcy*. Section 1104(c) of the United States Bankruptcy Code provides that the bankruptcy court "shall order" the appointment of an examiner "to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if [...]": (1) "such appointment is in the interests of creditors, any equity security holders, and other interests of the estate"; or (2) "the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes," exceed $5 million. 11 U.S.C. § 1104(c).

Both conditions—the interest of creditors and the Debtors' qualifying debts[1]—are satisfied, yet the Bankruptcy Court denied the Examiner Motion. This misreading of the plain language of the Bankruptcy Code defies sound bankruptcy policy as expressed by Congress, which believed that examiners were required to investigate and report on all cases of "great public interest." *See* 124 CONG. REC. S17, 403-34 (daily ed. Oct. 6, 1978) (statement of Senator DeConcini).

Examiners have played important, sometimes crucial, roles in the nation's largest and most controversial reorganizations, including in *Enron*,[2] *Worldcom*,[3] *Mirant*,[4] *New Century*,[5] *Lyondell Chemical*,[6] *Washington Mutual*,[7] and *Lehman*

---

[1] The Appellants' Omnibus Reply, *In re FTX Trading*, No. 22-11068, Doc. 601, at 2 (Feb. 1, 2023), indicates that the $5 million threshold was satisfied as to at least three debtors, West Realm Shires, Inc., FTX Trading, Ltd., and Alameda Research LLC. The "Debtors" or "FTX" are the debtors in these chapter 11 cases, *FTX Trading, Ltd.*, *et al*. No. 22-11068 (Bankr. D. Del.).

[2] *In re Enron Corp.*, No. 01-16034 (Bankr. S.D.N.Y. Dec. 2, 2001).

[3] *In re Worldcom*, No. 02-13533 (Bankr. S.D.N.Y. July 21, 2002).

[4] *In re Mirant Corp.*, No. 03-46591 (Bankr. N.D. Tex. July 14, 2003).

[5] *In re New Century TRS Holdings, Inc.*, No. 07-10416 (Bankr. D. Del. April 2, 2007).

[6] *In re Lyondell Chemical Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Oct. 26, 2009).

[7] *In re Washington Mutual, Inc.*, et al., No. 08-12229 (Bankr. D. Del. Nov. 1, 2008).

*Brothers*,[8] as well as more recent cryptocurrency cases, such as *Celsius*.[9] Bankruptcy examinations have been especially valuable to help explain and bring transparency to "freefall" bankruptcies (e.g., *Enron, Worldcom*), where the lack of planning impairs the ordinary bargaining dynamics of bankruptcy, enhancing the need for independent creditor protection.

2.    *The Debtors cannot conduct their own investigation*. The Bankruptcy Court denied the Examiner Motion because it believed that the Debtors and their professionals can vindicate the interest of creditors and the public through their own investigations and reports. But the Bankruptcy Code forbids debtors from investigating themselves, *see* 11 U.S.C. § 1107(a), and there are serious questions about the independence for these purposes of Debtors' counsel.

John Ray, the Debtors' new CEO, called the Debtors a "dumpster fire," and the allegations of massive misconduct "old fashioned embezzlement." Suppl. Decl. of John J. Ray III in Support of Retention Applications, *In re FTX Trading*, Doc. 511, at ¶ 9 (Jan. 17, 2023). But Sullivan & Cromwell ("S&C"), the Debtors' main bankruptcy counsel, also served as counsel to the Debtors in about 20 matters during

---

[8] *In re Lehman Brothers Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2008).

[9] *In re Celsius Network LLC*, 647 B.R. 631, 651 (Bankr. S.D.N.Y. 2023), leave to appeal denied, No. 23-CV-523 (JPO), 2023 WL 2648169 (S.D.N.Y. Mar. 27, 2023); *id.*; Ord. Approving the Appointment of Ch. 11 Exam'r, Doc 923 (Sept. 29, 2022).

the 16 months preceding bankruptcy, billing over $8.5 million for regulatory and transactional work. Suppl. Decl. of Andrew G. Dietderich, *In re FTX Trading*, Doc. 510, at ¶¶ 48-50 (Jan. 17, 2023) (hereinafter "Dietderich Decl."). These potential conflicts may constrain S&C's ability to independently investigate and report on the "dumpster fire" it represented before bankruptcy.

Notably, the order approving S&C's retention does not require the use of other professionals in case of a conflict of interest. Nor could it, since "conflicts counsel" (Quinn, Emanuel, Urquhart & Sullivan) has its own potential conflict: they too represented the Debtors in important matters before bankruptcy.

3.    *An examiner should address the extraordinary secrecy of these cases*. This Court has long held that transparency is an especially important value in judicial proceedings. Yet, scores of items on the docket of this case are sealed or heavily redacted. The potentially significant conflicts of the Debtors' professionals, combined with extraordinary secrecy, make it difficult to know who and what are being investigated, by whom, and to what end. An examiner should assess the sealed and redacted materials and determine whether and how to make such material more transparent.

4.    *An appropriate bankruptcy examination need not duplicate the efforts of estate fiduciaries*. Judge Dorsey viewed the Examiner Motion as an all-or-nothing proposition. To grant the motion, he feared, would require the estate to pay tens or

5

even hundreds of millions of dollars for an examiner, money that could otherwise go to creditors.

But he was wrong. Neither "all" nor "nothing" is an appropriate scope of examination here. Instead, Amici respectfully urge this Court to reverse the decision of the Bankruptcy Court denying the Examiner Motion and to instruct the Bankruptcy Court to order the appointment of an examiner to investigate and report on the independence of estate professionals who are supervising and conducting investigations here, and to make recommendations about the appropriate level of secrecy. In addition, an examiner should assure that the Debtors' investigations and reports are comprehensive and accessible to creditors, the investing public, and others with an interest in these cases, including regulators and lawmakers. To the extent the Debtors' reports fail to achieve these goals, the examiner should be authorized and funded to produce appropriate supplemental reports.

Amici recognize that the costs of this case are already significant. As explained below, however, bankruptcy courts can contain the costs of an examination by requiring an examiner to provide a workplan and budget in order to supplement, but not duplicate, other work with value to the estates. Indeed, a

properly targeted examination may help to bring the costs of this case under control.[10]

## ARGUMENT

### I.    Public and Creditor Interests Require a Targeted Independent Investigation and Report on the Spectacular Rise and Fall of FTX.

#### A.    The Public and Creditors Have a Strong Interest in Understanding the Causes and Consequences of Major Corporate Failures.

Congress has long recognized the interest of creditors and the public in understanding the causes and consequences of large and notorious corporate failures. And examiners have played a central role in protecting these interests.[11]

Under prior law, the public interest was addressed through the presumption that a bankruptcy trustee would displace the debtor's management, coupled with a

---

[10] Although a "fee examiner" was appointed in this case, she has deferred judgment on whether, or to what extent, professional fees should be reduced. *See* Fee Examiner's Second Interim Report, *In re FTX Trading*, Doc. 2427 (Sept. 5, 2023) (observing that most fees reviewed "are subject to enumerated concerns and potential objections to be addressed at a later stage of these proceedings."). "Fee examiners" are different from the examiner sought in the Examiner Motion. Although not provided for by the Bankruptcy Code, a fee examiner is "a person charged with assisting the court with its analysis of the reasonableness of the fees and expenses of estate-paid professionals in a case." *See* Lois R. Lupica, Nancy B. Rapoport, *Best Practices for Working with Fee Examiners,* 32 AM. BANKR. INST. J. 20 (2013).

[11] The House Report in support of the legislation that would become the Bankruptcy Code stated that "[t]he twin goals" of the standard for the appointment of an examiner, "should be protection of the public interest and the interests of creditors." H.R. REP. NO. 95-595, at 234 (1977).

statutory role for the Securities and Exchange tibunCommission. But these features of chapter 11 were not popular with practitioners, and Congress worried that they deterred corporate debtors from commencing reorganization cases. *See* Jonathan C. Lipson, *Understanding Failure: Examiners and the Bankruptcy Reorganization of Large Public Companies*, 84 AM. BANKR. L.J. 1, 12 (2010) (hereinafter *Understanding Failure*). Thus, the Bankruptcy Reform Act of 1978 reversed the presumption that a trustee would displace management and reduced the role of the SEC. *See* Aaron Levy, *The Role of the Securities and Exchange Commission and the Judicial Functions under the Bankruptcy Reform Act of 1978*, 54 AM. BANKR. L.J. 29, 29-30 (1980)*; see also* Bankruptcy Reform Act of 1978: Hr'g on S.2266 and H.R. 8200 Before the Subcomm. on Improvements in Jud. Machinery, 95th Cong. 622 (1977).

Instead, management would remain in possession and control of the debtor (as "debtor in possession" or "DIP") under sections 1101 & 1107 of the Bankruptcy Code. But management could not be expected to investigate itself. Congress thus created the role of an examiner to provide "special protection for the large cases having great public interest." 124 CONG. REC. S17, 403-34 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini).

Senator DeConcini, addressing the legislation that became chapter 11, stated that examiners would be appointed "automatically" in such cases. *Id.* The only appellate court to consider the question agreed, holding that examiners should be common features of all chapter 11 cases, and "mandatory" if requested in large ones. *See In re Revco D.S., Inc*., 898 F.2d 498, 501 (6th Cir. 1990) ("When the total 'fixed, liquidated, unsecured' debt is greater than $5 million, the statute requires the court to appoint an examiner.").

Practitioners, however, have resisted the accountability and transparency that Congress sought to provide through the bankruptcy examiner. While examiners have been features of large and controversial reorganizations, such as those involving *Enron, WorldCom,* and *Lehman Brothers*, they are "vanishingly rare" in most cases because "managers may fear scrutiny and creditors may worry about cost." Jonathan C. Lipson and Christopher Fiore Marotta, *Examining Success,* 90 AM. BANKR. L.J. 1, 5, 7 (2016) (hereinafter *Examining Success*).

Cost concerns appear to have driven Judge Dorsey's decision to deny the Examiner Motion. The word "public" appears nowhere in his ruling on it. Instead, the Bankruptcy Court framed the question solely in terms of creditors' interest in recovering "as much value as possible from the debtor's estate." Feb. 15 Hr'g Tr. 7:13-15. There were, he reasoned, "already multiple investigations underway by

9

incredibly competent and independent parties." *Id.*, 10:9-11. Thus, he said, "[e]very dollar spent in these cases on administrative expenses is a dollar less to the creditors." *Id.,* 10:18-20.

While cost concerns may be relevant to a bankruptcy court's determination of the appropriate scope of an examiner, maximizing creditor recoveries is not, and never has been, the sole policy goal of chapter 11. Instead, like other statutes, chapter 11 of the Bankruptcy Code balances a variety of "competing—and sometimes conflicting—values." *See* Elizabeth Warren, *Bankruptcy Policy*, 54 U. CHI. L. REV. 775, 777 (1987). Transparency is one such value: Chapter 11 has often been characterized as a "fishbowl"[12] because "[t]he key" to successful reorganization, the Second Circuit observed in the *Lionel* case, "is disclosure." *Comm. of Equity Sec. Holders v. Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) (citing H.R. REP. NO. 95-595, at 226 (1977)).

The Bankruptcy Court here feared that an examiner would cost millions of dollars and delay or interfere with efforts to reorganize the Debtors. *See* Feb. 15 Hr'g Tr. 9:21-24. But that need not be the case. Although the appointment of an examiner

---

[12] *See, e.g.,* Michelle M. Harner & Jamie Marincic Griffin, *Facilitating Successful Failures*, 66 FLA. L. REV. 205, 220 (2014) ("Once a company files for Chapter 11 bankruptcy, it basically operates inside a public fishbowl").

is not discretionary—"the word 'shall' admits of no discretion"[13]—bankruptcy examinations can and should be tailored to balance the interests of creditors and the public. *See Examiners in Bankruptcy Cases, A Guide for Examiners, Courts and Practitioners* (N.Y. City Bar. 2013-14).

Bankruptcy courts can, for example, reduce duplication by limiting and focusing examiners' investigations through work plans and budgets and otherwise follow best practices from other cases. *See id.* at App. A:9 (Letter from Anton R. Valukas, Examiner in *In re Lehman Bros. Holdings, Inc.* to Diana Adams, United States Trustee re: "Best Practices for Examiners").

An examiner's appropriate role in this case would not duplicate work already performed (or to be performed), but instead evaluate it for its completeness and independence given the unusual circumstances of this case, and would report findings to advance chapter 11's transparency goals consistent with the legitimate needs of creditors and other stakeholders.

Nor are the public interest and maximizing creditor recoveries mutually exclusive goals. In many cases, in fact, it appears that examiners have increased creditor recoveries precisely because they can provide a neutral assessment of estate

---

[13] *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486 (2015).

causes of action without need for wasteful and destructive litigation. A 2010 study found that examiner appointments correlated to probable estate recoveries in 60% of a sample of 576 of the largest chapter 11 cases commenced between 1991 and 2007 in which examiners were appointed. Lipson, *Understanding Failure, supra* at 18. The examiners in cases such as *Revco* and *Tribune*, for example, identified and assessed causes of action that increased creditor recoveries through settlements greater than that which litigation would likely have produced. *See* Daniel J. Bussel, *A Third Way: Examiners As Inquisitors*, 90 AM. BANKR. L.J. 59, 86 (2016).

### B.    "None" Is Not an "Appropriate" Examination of the FTX Debtors.

The Bankruptcy Court here concluded that the cost of any examination would outweigh its benefits, both public and private. But that was incorrect for three reasons: (1) examiners play a special role in protecting creditors and the public in freefall bankruptcies; (2) an examiner would relieve transparency concerns raised by the excessive secrecy of the case; and (3) an examiner would shed light on the nature of the cryptocurrency assets at the heart of this bankruptcy.

#### 1.    *The Public and Creditors Have an Inherent Interest in Understanding "Freefall" Bankruptcies.*

FTX is a "freefall" bankruptcy. Like the bankruptcies of *Enron, Lehman Brothers,* and *Worldcom*, FTX commenced its case "with virtually no planning." Lipson and Marotta, *Examining Success*, *supra* at 22. An independent examination of freefall cases may be especially valuable to enable the public to understand how

12

and why a spectacular failure occurred and to address power vacuums that result from a lack of planning. *See* Lipson, *Understanding Failure, supra* at 18 (observing that one "role for examiners will see them filling power vacuums . . .").

Large chapter 11 reorganizations are typically preceded by bargaining among small groups of concentrated economic stakeholders, as when senior secured creditors or large bondholders seek to negotiate a resolution with a debtor's management. *See* Jonathan C. Lipson, *The Rule of the Deal: Bankruptcy Bargains and Other Misnomers,* 97 AM. BANKR. L.J. 41, 43 (2023). Chapter 11 cases then implement the terms of the negotiated deal. *Id.*

*FTX* is unusual because there were no prebankruptcy negotiations, and there appear to be no dominant economic stakeholders participating in the reorganization. Instead, FTX's creditors are widely dispersed and lack the stakes and resources to coordinate or participate aggressively in the process. Although there is an official committee of unsecured creditors in the case (the "UCC"), it appears to be comprised of individual creditors or organizations that may lack relatively large claims and experience in chapter 11 reorganizations. *See* Amended Notice of Appointment of Committee of Unsecured Creditors, *In re FTX Trading*, Doc. 261 (Dec. 20, 2022). The identities of creditors are confidential, hampering efforts to coordinate claims trading to enable stronger bargaining positions to coalesce. *See* Confidentiality Order, *In re FTX Trading*, Doc. 1643 (June 15, 2023).

13

An examination with a properly tailored scope would fill this power vacuum, advancing both public and private interests while acting as a check on bankruptcy insiders (*e.g.*, lawyers and turnaround experts) who represent no particular economic stakeholders and draw fees from the proceedings. Indeed, the extraordinary fees already incurred in this case—estimated to exceed $300 million[14]—may reflect the lack of discipline endemic to freefall cases.

2.    *An Examiner Should Address the Secrecy of the Case.*

The Third Circuit has long championed transparency in the judicial process. *See Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 785 (3d Cir. 1994) ("Disturbingly, some courts routinely sign orders which contain confidentiality clauses without considering the propriety of such orders, or the countervailing public interests which are sacrificed by the orders.").

Bankruptcy achieves transparency through section 107 of the Bankruptcy Code, which provides that, subject to protection for trade secrets or to prevent identity theft, "a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge." 11 U.S.C. § 107(a). "During a chapter 11 reorganization," the

---

[14] *See* Rick Archer, *FTX Examiner Report OKs $111M In Professional Fees* https://www.law360.com/articles/1718547/ (Sept. 6, 2023) (noting that $320 million of the estate's funds have been spent on professional fees so far, "with the burn continuing at $1.5 million a day.").

Bankruptcy Court for the District of Delaware has reasoned, "a debtor's affairs are an open book." *See In re Alterra Healthcare Corp.*, 353 B.R. 66, 73 (Bankr. D. Del. 2006).

But in *FTX*, secrecy prevails.[15] Scores of items have been docketed under seal or in a redacted form.[16] These include such basic items as lists of the Debtors' creditors[17] and parties in interest;[18] who the Debtors will indemnify;[19] orders

---

[15] Certain media intervenors recently argued in an appeal in this case to the District Court that "an extraordinary level of secrecy" in this case "has kept the press, the public, and creditors in the dark about key—and routinely public—aspects of these consequential bankruptcy proceedings." *See* Brief of Appellants Bloomberg L.P., Dow Jones & Co., Inc., the New York Times Co., and the Financial Times, Ltd., Bloomberg et al. v. FTX Trading, Ltd., Aug. 21, 2023, Civ. Act. No. 23-682-CFC Doc. 7.

[16] A search of the docket shows that the word "seal" (or variations thereof) appears 156 times. *See* Docket, *In re FTX Trading* (Bankr. D. Del.).  The word "redact" (or variations thereof) appears 337 times.  By contrast, in the *Purdue Pharma* bankruptcy—pending three years longer than *FTX*—the word "seal" (or variations thereof) appears only 143 times and the word "redact" (or variations thereof) appears 303 times.  *See* Docket, *In re Purdue Pharma*, 19-23649 (Bankr. S.D.N.Y.).  Yet *Purdue Pharma* has been pending over three times longer than *FTX*, involves information at least as sensitive as in *FTX* (personally identifiable medical information), and commands public interest at least as great as *FTX*.  *See* Lipson, *Rule of the Deal, supra* at 45 (discussing notoriety of *Purdue Pharma* case).  The secrecy here is baffling.

[17] *See* Unsecured Creditor List, *In re FTX Trading*, Doc. 86 (Nov. 21, 2022) (SEALED); *see also id.*, Unsecured Creditor Lists, Docs. 168 and 169, (Nov. 29, 2022) (SEALED); *id.*, Statement for Ad Hoc Committee of Non-US Customers, Docs. 1136-1139 (Mar. 22, 2023) (SEALED).

[18] *Id.*, Parties in Interest List, Doc. 288 (Dec. 21, 2022) (SEALED).

[19] *Id.*, Interim Order re Indemnification, Doc. 141, (Nov. 22, 2022) (SEALED).

appointing "ordinary course" professionals,[20] and who or what the Debtors are investigating.[21] The Debtors have yet to file consolidated monthly operating reports, which would provide a basic picture of the Debtors' sources and uses of funds.[22] Indeed, even certain "disclosures" regarding the retention of Debtors' counsel, Sullivan & Cromwell, have been sealed.[23]

Professor Bruce recently warned that "*under-disclosure,*" through the expansive use of sealing orders and redaction, "carries risks, possibly leading to deep harms to the bankruptcy system and the parties it serves." *See* Kara J. Bruce, *[Redacted]: Creditor Privacy in Bankruptcy's Fishbowl,* 43:3 BANKR. L. LETTER 9 (Mar. 2023) (italics in original). An examiner should evaluate the sealed and redacted items in this case and report on whether the secrecy is warranted or, alternatively, explain why and how some such items should be made public, consistent with larger transparency norms that are central to bankruptcy and this Court.

---

[20] *Id.*, Lowenstein Sandler Ordinary Course Declaration, Doc. 661 (Feb. 8, 2023) (SEALED); *id.* Covington & Burling Ordinary Course Declaration, Doc. 848 (Mar. 10, 2023) (SEALED).

[21] *Id.,* Confidentiality Order, Doc. 656 (Feb. 8, 2023).

[22] Monthly operating reports are required to be filed under sections 704 & 1106 of the Bankruptcy Code.

[23] *In re FTX Trading,* Schedule 2 to Dec. 2022 Dietderich Decl., Doc. 271 (Dec. 21, 2022) (SEALED).

3.    *An Examiner Should Investigate and Report on the Novel Legal Status of FTX-held Cryptocurrency.*

The nature of digital assets—"cryptocurrency"—remains legally uncertain. Although courts typically treat such assets as a form of property, it is less clear whether (or under what conditions) they would qualify as property of the debtors' estates, rather than property of the customer, particularly here where the Debtors were operating partly as an "exchange" for cryptocurrencies.[24] In at least two cases, bankruptcy courts directed the appointment of examiners to help answer these very questions. *See In re Celsius Network LLC*, 647 B.R. 631, 651 (Bankr. S.D.N.Y. 2023), *leave to appeal denied*, No. 23-CV-523 (JPO), 2023 WL 2648169 (S.D.N.Y. Mar. 27, 2023); *In re CRED Inc.*, No. 20-12836 (Bankr. D. Del. Dec. 18, 2020) (Dorsey, J.).[25]

Professor Coordes has argued that "cases involving difficult-to-trace-and-classify digital assets, such as cryptocurrency, point to the desirability of having an examiner with specialized knowledge." *See* Laura N. Coordes, *Examining*

---

[24] Samuel P. Hershey & Kathryn Sutherland-Smith, *Two Sides of the Same Coin? Cryptoassets and Estate Property in Bankruptcy*, AM. BANKR. INST. J., Aug. 2022, at 18–19 ("if cryptoassets are not estate property, users of an exchange might not be subject to the automatic stay and will likely be entitled to the return, *in specie*, of their cryptoassets, leaving the debtor with limited ability to effectuate a restructuring, including by hampering its ability to raise new financing to fund its chapter 11 case.").

[25] Ord. Denying in Part, and Granting in Part, the Trustee/Exam'r Mot., 20-12836, Doc. 281 (Dec. 23, 2020).

*Examiners,* 43:2 Bᴀɴᴋʀ. L. Lᴇᴛᴛᴇʀ 1 (Feb. 2023). The *Celsius* examiner, for example, specialized in data privacy and cybersecurity. Professor Coordes argues that *Celsius* "illustrate[s] that an examiner may have significant value—as an expert, neutral point of information for regulators and others in the case—and that examiner appointments will likely continue to be a focal point as the uncertain world of digital assets continues to collide with the bankruptcy system." *Id.*

An examiner would independently and efficiently answer questions about the legal status of FTX's cryptoassets, avoiding or reducing the need for costly and potentially wasteful litigation.

## II.  Professionals' Potential Conflicts of Interest Warrant Appointment of an Independent Examiner.

The Debtors and S&C may object that they and other professionals retained in the case can effectively address these questions. Bankruptcy Judge Dorsey, they may argue, equated Mr. Ray with an examiner: "There is no question" he said when denying the Examiner Motion, "that an examiner . . . appointed pursuant to Section 1104 would have the same attributes as Mr. Ray and the independent directors." *See* Feb. 15 H'rg Tr. 9:8-11.

18

This was an error. The Bankruptcy Code forbids a debtor in possession from investigating and reporting on itself.[26] It makes no exception for debtors whose management changes while free-falling into bankruptcy. At the very least, the appearance of potential conflicts of Debtors' counsel could threaten public confidence in their genuine independence.

## A.    Counsels' Prebankruptcy Representations of FTX

The Debtors have two main bankruptcy counsel, Sullivan & Cromwell (S&C) and Quinn, Emanuel, Urquhart & Sullivan (QM). Both were retained at the outset by Mr. Ray and both have potential conflicts of interest due to their prebankruptcy engagements by the Debtors and the Debtors' prior CEO, Sam Bankman-Fried, who is currently under indictment (as discussed below). While Judge Dorsey implied that these prior connections did not disqualify these firms from representing the estate as

---

[26] 11 U.S.C. § 1107(a) provides, "Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, *except the duties specified in sections 1106(a)(2), (3), and (4) of this title*, of a trustee serving in a case under this chapter."   (emphasis supplied). Section 1106(a)(3) & (4) provide that the trustee (or an examiner) shall "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan" and  "file a statement of any investigation conducted under paragraph (3) . . . ." 11 U.S.C. § 1106(a).  The debtor in possession is thus specifically excluded from conducting and reporting on these matters.

debtor in possession, he made no factual findings on their capacity to be independent for purposes of an examination under section 1104(c). Quite the contrary: he simply assumed this to be the case.

But S&C was counsel to the Debtors for the 16 months preceding the Petition Date in about 20 matters, billing around $8.5 million. Dietderich Decl. at ¶¶ 48-50. S&C's pre-bankruptcy role presents at least three questions that would impair its capacity to independently investigate the Debtors, and thus requires examination under section 1104(c).

First, an examiner should determine the scope and nature of S&C's pre-bankruptcy work for the Debtors, which is disputed. Andrew Dietderich, the Sullivan & Cromwell partner leading the bankruptcy, declared in connection with S&C's retention that the scope of S&C's prebankruptcy involvement was narrow, and limited to "particular matters." *See* Dietderich Decl. at ¶ 47. In contrast, FTX's former chief legal officer, Dan Friedberg, declared that while "S&C claims to never have served as primary outside counsel of the FTX entities, . . . [t]his is false. S&C was primary outside counsel of FTX.US, LedgerX, and the Emergent entity." *See* Decl. of Daniel Friedberg, *In re FTX Trading*, Doc. 530 at ¶ 74 (Jan. 19, 2023) (hereinafter Friedberg Decl.).

Second, several in-house attorneys at FTX—in particular Ryne Miller and Tim Wilson—were S&C alumni, Miller as a partner and Wilson as an associate. Dietderich Decl. at ¶¶ 62-63.[27] In the hours preceding the Petition Date, Mr. Miller apparently declared himself "in charge," although it is not clear what this meant, or how he would have obtained this authority.[28] Nevertheless, it appears that both Miller and Wilson played critical roles in persuading prior management to step down and turn control over to Mr. Ray, discussed further below.

Third, it appears that S&C also performed transactional work for Bankman-Fried personally, "arranged for and paid by Debtor Alameda Research Ltd. (total historical fees $195,000)." *See* Decl. of Andrew G. Dietderich in Support of Debtors' Application for Order Authorizing the Retention of Sullivan & Cromwell Doc. 270-3, at 2, n. 1 (Dec. 21, 2022). While the scope and nature of that work are unclear,

---

[27] Mr. Miller, the General Counsel of FTX US, was a partner of S&C, from January 2019 through July 2021 and an associate for several years before being elected partner. *Id.* at ¶ 62. Mr. Wilson was a member of the FTX Trading legal team and a former associate of S&C from September 2019 to April 2021. *Id.* at ¶ 63. Ms. T'Shae Cooper, a former member of the Alameda legal team, was a former associate of S&C from September 2015 to June 2018. *Id.* at 19. Ms. Kelly Yamashita, a former Alameda employee in Hong Kong, was an associate of S&C from September 2015 to September 2018. *Id.* at ¶ 65.

[28] *See* Joshua Oliver, *'Sam? Are you there?!' The bizarre and brutal final hours of FTX*, Fin. Times, Feb. 9, 2023, https://www.ft.com/content/6e912f25-f1b7-4b19-b370-007fbc867246.

S&C's dual representations prior to bankruptcy require independent investigation and explanation.

The fact that the Debtors' independent directors are represented by Quinn Emanuel is no answer to the independence question. QM has its own potential conflicts with the Debtors, having provided advice on, among other things, Foreign Corrupt Practices Act compliance and cybersecurity matters before bankruptcy. *See Quinn Emanuel Application, In re FTX Trading*, No. 22-11068, Doc. 280, at 11 (Bankr. D. Del. Dec. 21, 2022).

In short, unanswered questions about counsels' prebankruptcy work for the Debtors make it impossible to know whether the Debtors are even capable of independently investigating themselves, as the Bankruptcy Court imagined. The extraordinary secrecy of these cases compounds this problem.

## B.    Sullivan & Cromwell's Disputed Role in the FTX Change of Control

There are also questions about how Mr. Ray came to control the Debtors, and S&C's role in that change of control. The Debtors collapsed over a period of about 48 hours from November 8 to 10, 2022, after it became clear that cryptocurrency depositors would not be able to make withdrawals, and Bankman-Fried was unable to find funding or a buyer for the business.

Bankman-Fried has asserted that, starting on November 8, 2022, he was "put under extreme pressure to file for chapter 11" by FTX legal advisors, and to relinquish control to Mr. Ray. *See Exclusive Transcript: The Full Testimony Bankman-Fried Planned to Give to Congress*, FORBES, Dec. 13, 2022, at 10, https://www.forbes.com/sites/stevenehrlich/2022/12/13/exclusive-transcript-the-full-testimony-sbf-planned-to-give-to-congress/ (hereinafter *Bankman-Fried Planned Testimony*).[29] "Most of that pressure," Bankman-Fried has said, came from Mr. Miller, the former S&C partner who became general counsel of FTX.US and had then just declared himself "in charge." *Id.*

Bankman-Fried claims that he bowed to this pressure and executed an "Omnibus Corporate Authority" at around 4:30 A.M. the morning of November 10, 2022, because S&C promised that, if he complied, he could choose the chair of the Debtors' board and continue his efforts to raise new capital. *Id.*[30] Bankman-Fried has asserted that S&C "silently reneged" on that promise. *Id.* at 10. He has also asserted that within about 10 minutes of executing the Omnibus Corporate Authority, he instructed his counsel to rescind it. *Id.*

---

[29] Bankman-Fried offered a brief account of the events leading up to the transfer of authority in testimony he prepared (but never gave) for the House Committee on Financial Services. *See Bankman-Fried Testimony*.

[30] The Omnibus Corporate Authority is attached to the Debtors' chapter 11 petition, which appears in the Joint Appendix, J.A. 28.

Mr. Dietderich, on behalf of S&C, has asserted a conflicting version of events. The claim that Bankman-Fried was "put under extreme pressure to file for Chapter 11" by S&C was, Dietderich declared, "false." Dietderich Decl. at ¶ 4-5. "[A]t no time," Dietderich stated, "did Mr. Bankman-Fried or his counsel inform me that Mr. Bankman-Fried attempted to revoke the Omnibus Authority after he signed it." *Id.* at ¶ 38.

At the same time, Mr. Miller and S&C had also approached prosecutors and regulators to report their concerns about the Debtors. Dietderich has stated that "[o]n November 9, 2022, Mr. Miller advised me that he had informed state regulators of prudential problems reconciling entitlements and digital assets on the FTX US exchange." *Id.* at ¶ 16. This was one day after Dietderich met with Miller about FTX's potential bankruptcy. *Id.* at ¶ 10 ("At 8:44 a.m. [November 8, 2022], I received an email from Mr. Sun asking me to join a videoconference with him and Mr. Miller. In that videoconference I was informed by Mr. Sun that he had learned FTX International could not cover customer liabilities."). Thereafter, "S&C attorneys in our Criminal Defense & Investigations Group, in consultation with Mr. Miller, reported the concern to federal authorities, including the United States Attorney's Office for the Southern District of New York, the Securities and Exchange Commission and the Commodity Futures Trading Commission." *Id*. at ¶ 16.

If FTX's legal advisors, in particular S&C and its alumni at FTX (*e.g.,* Miller), were promising Bankman-Fried that he would retain a significant role in reorganizing the Debtors while simultaneously seeking to induce his prosecution, two questions arise: (i) was Bankman-Fried's agreement to transfer authority to Ray contractually enforceable?, and (ii) were there ethical violations of the duty of candor?[31]

An examiner should investigate the conflicting versions of the events leading to the change in control of FTX. If there were defects in the execution, delivery or enforceability of the Omnibus Corporate Authority, then Mr. Ray may never have received adequate authority to commence these cases at all. Even if it was effective, conflicting claims about the conduct of S&C's current and former attorneys during that period warrant an independent investigation and report.

### C.   Sullivan & Cromwell's Ongoing Role in Insiders' Prosecutions

It appears that Sullivan & Cromwell and Mr. Ray have played an active and aggressive role in supporting the prosecution of Bankman-Fried and the Debtors' other prebankruptcy insiders. It is not, however, clear whether (or how) this benefits the estate or, instead, seeks to deflect attention from the role that S&C may have played before and during the crisis that led to the Debtors' bankruptcy.

---

[31] Rule 4.1, *NYSBA NY Rules of Professional Conduct* (2021).

At the hearing on S&C's retention, S&C's James Bromley argued that "one of the things that we have done . . . is lead the interaction with the regulatory and criminal authorities." H'rg Tr., Doc. 558 (Jan. 20, 2023), 28:8-10. Since then, Bankman-Fried has alleged in his criminal prosecution that "[t]he Government has effectively deputized Mr. Ray, the FTX Debtors, and their counsel as federal agents to review and synthesize the evidence for them." Discovery Br., *U.S. v. Bankman-Fried*, No. 22-cr-00673, Doc. 143, at 1 (S.D.N.Y. May 8, 2023).

Bankman-Fried's criminal defense counsel has documented hundreds of hours of attorney-time on calls and correspondence "collecting, reviewing, and analyzing documents" costing the estate "tens of millions of dollars." *Id.* They have asserted that the government is using FTX and S&C to evade *Brady* duties to produce exculpatory evidence and to "deflect blame from themselves." *See id.* at 12. Indeed, there is evidence that S&C is "coordinating" with the government's efforts to seize insiders' assets—assets to which the Debtors may assert conflicting claims—raising further questions about S&C's role in this case. *See, e.g.,* S&C Third Fee Application, Doc. 818-2, at 3, 29, 29 (Mar. 6, 2023) (correspondence regarding Robinhood shares); S&C Fifth Fee Application, Doc. 1388-2 at 15 (Apr. 28, 2023) (time entry describing "coordination of federal regulator forfeiture and asset recoveries").

While the fee examiner or the UCC may ultimately challenge fees incurred in connection with these services to prosecutors, they have little incentive or capacity to address the more basic question, which is whether S&C's support of the insiders' criminal prosecution seeks to deflect attention from its prebankruptcy role with the Debtors.

Nor is the UCC here capable of supervising and investigating the conflicts among the involved professionals. As noted above, FTX's creditors are widely dispersed and lack the stakes or resources to coordinate or participate aggressively in the process. And the public docket does not reflect an active involvement by the UCC in fulfilling this role. Even if the UCC had such capacity, that would only be grounds to tailor—not to deny—an examiner in these cases.

The only way to assure that the interests of the public and creditors are vindicated in these extraordinary cases is to have an independent examiner investigate and report on the independence of those in control of the Debtors' reorganization. If those investigations are adequate, but appropriately sealed, then the examiner's task may simply be to monitor and report on those investigations in collaboration with the Debtors and other estate fiduciaries. If, however, more serious concerns about independence are revealed by the examiner, then it will be better to know and address such concerns sooner than later.

In 1966, Judge Friendly admonished that "[t]he conduct of bankruptcy proceedings not only should be right but must seem right." *In re Ira Haupt & Co.,* 361 F.2d 164, 168 (2d Cir. 1966). The disputed roles of S&C and QM, and the extraordinary secrecy of these freefall cases, require assurance that these cases both are—and appear to be—conducted appropriately.

Amici are sensitive to the incredible "burn rate" of professional fees in these cases. *See* Archer, *supra* (reporting costs of $1.5 million per day). That, however, is not an argument against an examiner. Rather, it shows the need for an independent examiner to bring discipline to this extraordinary case.

# CONCLUSION

For the foregoing reasons, the Bankruptcy Court's order denying the Examiner Motion should be reversed and remanded. The Bankruptcy Court should be instructed to order the appointment of an examiner under section 1104(c) of the Bankruptcy Code to assure that: (i) the Debtors' reports are comprehensive and accessible to creditors, the public and interested government officials; (ii) estate professionals are "independent" for purposes of overseeing such investigations (and to report whether this is, or is not, the case); (iii) the examiner has resources adequate to undertake the foregoing; and (iv) the examiner avoid duplication of efforts and otherwise use best practices to contain the costs of the examination.

Respectfully submitted,

Dated: September 8, 2023

LANGER GROGAN & DIVER, P.C.

*/s/ Irv Ackelsberg*

Jonathan C. Lipson (NY ID No. 2429140) (Admission pending)
Harold E. Kohn Professor of Law
Temple University
Beasley School of Law
1719 North Broad Street
Philadelphia, PA 19122
(215) 204-0608
jonathan.lipson@temple.edu

Irv Ackelsberg (PA ID No. 23813)
John J. Grogan (PA ID No. 72443)
David A. Nagdeman (PA ID No. 327652)
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Telephone: (215) 320-5660
iackelsberg@langergrogan.com
jgrogan@langergrogan.com
dnagdeman@langergrogan.com

*Attorneys for Amici Curiae Law Professors*

29

## APPENDIX A
## Amici Law Professors

**Kara Bruce** is a professor of law at the University of Oklahoma School of Law and an affiliate faculty member of the University of Oklahoma's Price College of Business. Her research and teaching focuses on bankruptcy and commercial law issues and she has published several articles on crypto-industry bankruptcy cases. She is a former Scholar in Residence at the American Bankruptcy Institute, a contributing editor to the *Bankruptcy Law Letter*, and a coauthor of the forthcoming sixth edition of the Law of Bankruptcy treatise (with Charles Tabb and Laura Coordes), as well as Problems and Materials on Secured Transactions (with Stephen Sepinuck).

**Laura N. Coordes** is Professor of Law at Arizona State University's Sandra Day O'Connor College of Law. She is a contributing editor for *Bankruptcy Law Letter* and currently serves as the Reporter for the Uniform Law Commission's Drafting Committee on Assignments for the Benefit of Creditors. Professor Coordes was honored as a member of the American Bankruptcy Institute's "40 Under 40" in 2020. She has published numerous articles in the areas of bankruptcy and commercial law and is author of *The Law of Bankruptcy* (forthcoming), with Charles Tabb and Kara Bruce.

30

**A. Mechele Dickerson** is the Arthur L. Moller Chair in Bankruptcy Law and Practice and University Distinguished Teaching Professor at the University of Texas at Austin.  She began her teaching career at William & Mary Law School before joining the UT faculty in January 2006. Professor Dickerson is a nationally recognized scholar on financial vulnerability, consumer debt, housing affordability, and racial and economic disparities.  She is an elected member of the American Law Institute and an elected fellow of the American College of Bankruptcy.

**Pamela Foohey** Pamela Foohey is Professor of Law at the Benjamin N. Cardozo School of Law, Yeshiva University. She was previously Professor of Law at Indiana University Maurer School of Law. She researches and teaches in the areas of bankruptcy, commercial law, and consumer finance, and has published numerous articles in the areas of bankruptcy and commercial law, including in the *American Bankruptcy Law Journal, Virginia Law Review*, and *Southern California Law Review*, among other journals. Prior to teaching, Professor Foohey clerked for the Honorable Thomas L. Ambro of the Third Circuit Court of Appeals, worked as an associate in the Bankruptcy and Financial Restructuring Group of Dorsey & Whitney LLP, and clerked for the Honorable Peter J. Walsh of the Bankruptcy Court for the District of Delaware.

**Jonathan C. Lipson** holds the Harold E. Kohn Chair and is a Professor of Law at Temple University Beasley School of Law. In addition to Temple, he has

taught at the law schools of the University of Wisconsin (where he held the Foley & Lardner Chair), the University of Pennsylvania, and the University of Baltimore. He is a member of the American Law Institute, a Regent of the American College of Commercial Finance Lawyers, and has held a number of leadership positions with the Business Law Section of the American Bar Association, where he is now Assistant Reporter for the Model Business Corporation Act. Professor Lipson has published in some of the nation's leading journals, including two articles reporting on his empirical study of the use of examiners in chapter 11 bankruptcies, the second of which won the Editors' Prize as the best paper published in the *American Bankruptcy Law Journal* in 2016.[32]

**Bruce A. Markell** was appointed the Professor of Bankruptcy Law and Practice at Northwestern in 2015. From 2013 to 2015, he was the Jeffrey A. Stoops Professor of Law at Florida State University School of Law, and before that he was a United States Bankruptcy Judge for the District of Nevada, a position he had held since 2004. After law school, he clerked for then-judge Anthony M. Kennedy on the Court of Appeals for the Ninth Circuit. Before taking the bench, he practiced

---

[32] *Understanding Failure: Examiners and the Bankruptcy Reorganization of Large Public Companies*, 84 AM. BANKR. L.J. 1 (2010); *Examining Success*, 90 AM. BANKR. L.J. 1 (2016) (with C. Marotta).

bankruptcy and business law in Los Angeles for ten years (where he was a partner at Sidley & Austin), and was a law professor for fourteen. From 2006 to 2013, he was also a member of the Bankruptcy Appellate Panel for the Ninth Circuit.

**Juliet M. Moringiello** is the Associate Dean for Academic Affairs at Widener University Commonwealth Law School in Harrisburg, PA. She regularly teaches courses in Bankruptcy, Property, Sales, and Secured Transactions and teaches a seminar on Business Law and Emerging Technologies. Prof. Moringiello is an elected member of the American Law Institute, a fellow in the American College of Commercial Finance Lawyers, and a Uniform Law Commissioner for Pennsylvania. She was the Vice-Chair of the ALI/ULC Drafting Committee for the 2022 Amendments to the Uniform Commercial Code and is a member of the Permanent Editorial Board for the Uniform Commercial Code.

**Chrystin Ondersma** is the Professor of Law and Judge Morris Stern scholar at Rutgers Law School. Her scholarship considers human rights and social justice implications for laws and policies governing business and credit. Her recent papers have been published in the American Bankruptcy Law Journal, North Carolina Law Review, Journal of Corporate Law, Colombia Law Review Forum, the Colorado Law Review, and the Minnesota Law Review. She received her J.D. magna cum laude from Harvard Law School where she was an executive editor of the *Harvard*

*Civil Rights-Civil Liberties Law Review.* Prior to joining Rutgers, she clerked for the Honorable Michael Daly Hawkins of the U.S. Court of Appeals for the Ninth Circuit and worked as an associate in the Business Finance and Restructuring Department at Weil, Gotshal & Manges LLP in New York.

**Nancy B. Rapoport** is a UNLV Distinguished Professor, the Garman Turner Gordon Professor of Law at the William S. Boyd School of Law, University of Nevada, Las Vegas, and an Affiliate Professor of Business Law and Ethics in the Lee Business School at UNLV. She is a Fellow of the American Bar Foundation and a Fellow of the American College of Bankruptcy. In 2017, she received the Commercial Law League of America's Lawrence P. King Award for Excellence in Bankruptcy, and in 2018, she was one of the recipients of the NAACP Legacy Builder Awards (Las Vegas Branch #1111). In 2022, she received the UNLV Alumni Association's Outstanding Faculty Member of the Year Award.

## COMBINED CERTIFICATES OF COMPLIANCE

I hereby certify that:

1.    At least one of the attorneys whose names appear on the foregoing brief, including the undersigned, is a member of the bar of this Court, as required by Local Rule 28.3(d).

2.    Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5). Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f) and Local Rule 29.1(b), the brief contains 6,269 words.

3.    The brief has been prepared in proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO (Version 2308 Build 16.0.16731.20052) in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

4.    In addition, pursuant to Third Circuit Local Appellate Rule 31.1(c), I certify that the text of the brief filed with the Court via CM/ECF is identical to the text of the paper copies. I further certify that the electronic version of the brief has

been scanned for viruses by Trend Micro OfficeScan 6.7.3595/14.3.1118 (updated

continuously) and is, according to that program, free of viruses.

/s/ Irv Ackelsberg
Irv Ackelsberg

**CERTIFICATE OF SERVICE**

I, hereby certify that on this day 8th day of September, 2023, I electronically filed the foregoing Brief of Amici Curiae Law Professors in Support of Appellant on the Role of Bankruptcy Examiners in Chapter 11 Reorganization with the Clerk of the United States Court of Appeals for the Third Circuit using the CM/ECF system. Counsel for all parties are registered CM/ECF users and will be served by the appellate CM/ECF System.

DATED: September 8, 2023

*/s/ Irv Ackelsberg*
Irv Ackelsberg (PA ID No. 23813)
John J. Grogan (PA ID No. 72443)
David A. Nagdeman (PA ID No. 327652)
LANGER GROGAN & DIVER, P.C.
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Telephone: (215) 320-5660
Facsimile: (215) 320-5703

Jonathan C. Lipson (NY ID No. 2429140)
Harold E. Kohn Professor of Law
Temple University--Beasley School of Law
1719 North Broad Street
Philadelphia, PA 19122
215.204.0608
jlipson@temple.edu

*Attorneys for Amici Curiae Law Professors*